# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| SHANE TRABBOLD, | : | CIVIL ACTION |
| --- | --- | --- |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MIKE'S HARD LEMONADE, et al., | : | NO. 09-4235 |
| Defendants. | : | |

## MEMORANDUM OPINION

TIMOTHY R. RICE  May 26, 2011
U.S. MAGISTRATE JUDGE

Defendant Anchor Glass Container Corporation ("Anchor") seeks summary judgment on all claims and cross-claims against it by the five other parties to this action. Plaintiff and two of Anchor's co-defendants oppose the motion. Because the record before me is devoid of admissible, non-speculative evidence that would support a jury verdict against Anchor, I will grant Anchor's motion.

Plaintiff Shane Trabbold claims he was injured while opening a bottle of Mike's Hard Lemonade on December 31, 2008. See 3d Party Def., Anchor Glass Container Corp.'s Br. Supp. Mot. Summ. J. at Ex. A ¶ 7, Trabbold v. Mike's Hard Lemonade, No. 09-4235 (E.D. Pa. Aug. 16, 2010) [hereinafter Anchor's Brief]. He seeks damages from Anchor and four other parties,[1]

---

[1]The other defendants are: Mark Anthony Brands ("MAB"), originally named as "Mike's Hard Lemonade," which is a MAB product; High Falls Brewing Company ("High Falls"), the bottling company that filled, capped and labeled the product; NKS Distributors ("NKS"), which transferred the product from High Falls to retailers; and Ridge Liquors, the retailer from which Plaintiff bought the bottle at issue. See Stmt. Material Facts Supp. Anchor's Mot. Summ. J. at ¶¶ 2-5, Trabbold v. Mike's Hard Lemonade, No. 09-4235 (E.D. Pa. Aug. 16, 2010); Answer & New Matter of MAB at ¶¶ 2, 5, Trabbold v. Mike's Hard Lemonade, No. 09-4235 (E.D. Pa. Oct. 20, 2009).

alleging claims of negligence, breach of warranty, and strict products liability.[2]  See Anchor's Brief at Ex. A; Plaintiff's Response to Ridge Liquors' Motion at Ex. 1.  Anchor has moved for summary judgment on all claims and cross-claims asserted against it.  See Anchor's Brief at 9-19.

Entry of summary judgment is appropriate only where "there is no genuine issue as to any material fact."  Fed. R. Civ. P. 56(c)(2).  I must "view the facts and draw inferences in the light most favorable to the nonmoving party."  Ray v. Twp. of Warren, 626 F.3d 170, 173 (3d Cir. 2010).  A genuine issue as to a material fact exists when "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  Here, even drawing all inferences in favor of the nonmoving parties, Anchor is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c)(2).

All three of Plaintiff's claims against Anchor require him to demonstrate the bottle at issue was defective at the time it left Anchor's control.  See Pappas v. Sony Elecs., Inc., 136 F. Supp. 2d 413, 427-28 (W.D. Pa. 2000) (explicitly listed in elements of strict products liability claim, and implicitly included in elements of breach of warranties and negligence claims).

---

[2]Although Plaintiff's initial complaint alleged no claims against Anchor, see Anchor's Brief at Ex. A, MAB filed a third-party complaint against Anchor, see Anchor's Brief at Ex. B, and a subsequent complaint by Plaintiff asserting claims against Anchor was consolidated with this action.  See Pl.'s Resp. Def. Ridge Liquors' Mot. Summ. J. at Ex. 1, Trabbold v. Mike's Hard Lemonade, No. 09-4235 (E.D. Pa. Aug. 30, 2010) [hereinafter Plaintiff's Response to Ridge Liquors' Motion]; Order, Trabbold v. Mike's Hard Lemonade, Nos. 09-4235 & 10-4257 (E.D. Pa. Oct. 14, 2010).  Anchor renewed its motion for summary judgment after the actions were consolidated, see Def., Anchor Glass Container Corp.'s 2d Mot. Summ. J., Trabbold v. Mike's Hard Lemonade, No. 09-4235 (E.D. Pa. Apr. 12, 2011), extending its request for dismissal to all claims against it by any party to this action.  This Order disposes of both the original motion (doc. 94) and the renewed motion (doc. 126).

Resolution of Anchor's motion, therefore, turns on the reports and deposition testimony of six experts who have examined the bottle and opined regarding what caused it to break.

The experts retained by Anchor and High Falls -- Richard Bayer[3] and Howard P. Medoff, respectively -- did not conclude with a reasonable degree of engineering certainty that a defect was introduced into the bottle when it was manufactured by Anchor or filled and capped by High Falls. See Anchor's Brief at Ex. M; Mot. Yashipodja, Inc. d/b/a Ridge Liquors Summ. J. at Exs. M, N, Trabbold v. Mike's Hard Lemonade, No. 09-4235 (E.D. Pa. Aug. 16, 2010). Instead, Bayer and Medoff both opined the bottle broke in response to severe external impact at or near the time Plaintiff was injured. Id.

NKS's expert, David P. Pope, initially believed the bottle broke due to a manufacturing defect, which he described as "a crack that pre-existed under the cap where the cap was crimped to the neck of the bottle." Anchor's Brief at Ex. O. He did not specify how or when such a crack occurred. Id. After reviewing deposition testimony describing the capping process at High Falls and certain problems that arose at High Falls on the day the bottle at issue was filled and capped, see id. at Ex. G, Mr. Pope revised his opinion in a supplemental report. He stated: "I conclude to a reasonable degree of engineering certainty that the pre-existing crack that precipitated this accident was introduced into the bottle during the crowning operation at High Falls Brewing, not during the original manufacture of the bottle by Anchor Glass." Id. at Ex. P.

Plaintiff's expert, Craig D. Clauser, prepared a report in which he concluded, "to a reasonable degree of engineering certainty:" "The bottle broke while [Plaintiff] was attempting to

---

[3]Bayer examined the fractured bottle microscopically. See Anchor's Brief at Ex. M. The only other expert to do so was Plaintiff's. See id. at Ex. L.

3

open it because it was in a defective and weakened condition. A small crack was present in the lip of the bottle under the cap." Id. at Ex. L. Clauser further explained, "[t]he location of the crack under the undamaged cap indicates that the crack occurred at [the] time or before the cap was placed on the bottle." Id. He did not include any further discussion of precisely how the defect he described was introduced into the bottle, or whether it occurred during the manufacturing, filling, labeling, or capping process. Id. When Clauser was deposed, after he had reviewed information about problems causing excessive breakage at High Falls on the date the bottle at issue was capped, Clauser clarified his opinion. He testified it was "more likely than not, the crack in the bottle that caused the bottle to fail was introduced during the capping process at the bottler's plant." Id. at Ex. S. He agreed he saw no "physical evidence of a manufacturing defect in the glass." Id.

According to his initial report, MAB's expert, Miles F. Buchman, identified "a preexisting flaw in the lip of the bottle, under the cap." Id. at Ex. Q. Buchman noted the flaw "was either present in the bottle as it was being filled or was caused by the capping operation after fil[l]ing." Id. He concluded, "within a reasonable degree of engineering certainty," that the flaw "lowered the ability of the bottle to resist the applied torsional force and resulted in the failure and fracture of the bottle at the neck." Id. Like the other experts, Buchman provided no detail regarding how the defect he described was introduced into the bottle. Id.

When deposed, Buchman gave the following testimony: (i) although Anchor's manufacturing process could have caused a defect in the bottle, it was not the only possibility, and he could not say "with a reasonable degree of engineering certainty" that the manufacturing process was the cause of the defect; (ii) he could not "pinpoint any specific process" during

4

Anchor's manufacturing of the bottle "that caused the accident at issue;" (iii) although improper cooling or formation of the bottle could have introduced "a non-uniform condition" into its neck, Buchman did not microscopically examine the bottle for evidence of such a condition, nor did he review literature on the subject; and (iv) he did not know whether the bottle was cooled improperly. See Mem. Law Supp. Resp. Ridge Liquors Opp'n Mot. Summ. J. 3d Party Def. Anchor at Ex. B, Trabbold v. Mike's Hard Lemonade, No. 09-4235 (E.D. Pa. Aug. 30, 2010) [hereinafter Ridge Liquors' Response]. After his deposition, Buchman reviewed information about the capping problems at High Falls and supplemented his initial report, saying his opinions "remain the same," but offering a slightly modified conclusion: "The bottle failed due to a flaw in the neck area, under the cap, caused during either the bottle manufacturing or more likely during the product bottling operation at High Falls Brewing Company." Anchor's Brief at Ex. R.

The sixth and final expert, George A. Pecoraro for Ridge Liquors, believed the bottle fractured "because it was damaged prior to being delivered to Ridge Liquors." Id. at Ex. N. He further opined:

> The source of the damage to the glass that lead [sic] to the catastrophic fracture of the bottle resulted from the lip of the bottle and/or the twist off bottle cap being defective in manufacture and/or design, or by the process of capping the bottle. The damage to the lip of the bottle likely resulted from or during the bottle forming machine process at [Anchor] or the capping process at [High Falls]. The process of forming a bottle from molten glass is a very temperature sensitive process that could result in cracking, particularly at the very high speed at which they are made from a process that can easily become out of control. In the [High Falls] plant, the empty bottles supplied by [Anchor] are conveyed through an automated production line. The bottles are washed inside and out, dried, filled with the product, labeled and finally capped.

Id. Pecoraro rendered his opinion "based on [his] education, [his] studies of the open literature

5

and [his] 50 years experience with glass science and engineering within a high degree of certainty." Id. None of the documents, research, or reference information Pecoraro reviewed in preparing his initial report specifically pertained to Anchor's manufacturing processes. See id. (listing discovery and depositions produced by Plaintiff and other defendants, as well as general reference materials).

After reviewing deposition testimony of corporate representatives from Anchor and High Falls, Pecoraro issued a supplement to his report. See id. at Ex. N (including letter dated June 25, 2010). He stated the information from High Falls' representative described "mechanical problems [in the capping process that] can lead to bottles that are slightly damaged [but] are not identified and culled from the line." Id. As to Anchor, he commented on only two specific inspection processes and hypothesized that "[t]here could be a crack sufficiently small to pass through the inspection system" and end up causing injury to a customer. Id. He was unable to identify any specific basis -- besides the fact of Plaintiff's injury -- for believing Anchor introduced a defect into the bottle. See id. (broadly concluding "[i]t is simply impossible to thoroughly inspect hundreds of bottles per minute").

In his subsequent deposition, Pecoraro was asked to distinguish between the manufacturing and capping processes, which he described as the two possible phases when the bottle may have been damaged.[4] See Ridge Liquors' Response at Ex. C. He testified as follows:

---

[4]Apparently based on his general knowledge of the manufacturing process, Pecoraro speculated a flaw could be introduced into a glass bottle in a number of ways: "In the manufacturing of a bottle it could have been tripped or nipped someplace along the line. It could not have been properly annealed. Some part of the equipment could've damaged it in the conveyance of the bottle in the factory . . . ." Ridge Liquors' Response at Ex. C. The record contains no indication this speculation was based on any specific knowledge of Anchor's manufacturing process or the formation of the bottle at issue here. Speculative testimony, of

6

| | | |
|---|---|---|
| Q: | Are you able to say, to a reasonable degree of engineering probability, that more likely than not the crack in the bottle was introduced during the manufacturing process as opposed to some other point in the life of the bottle? | |
| | \*   \*   \* | |
| | Are you able to say that to an engineering degree of certainty? | |
| A: | I'm saying it's likely one of the two. I'm not going to say it's one or the other. | |
| Q: | Are you able to say that one of the two is more likely than the other of the two? | |
| | \*   \*   \* | |
| | To an engineering degree of certainty? | |
| A: | I'm not going to say that. | |
| Q: | Are you saying that the two possibilities are equally likely, or are you saying that you just have no way of knowing or distinguishing between the two? | |
| A: | No way of knowing. | |

Anchor's Brief at Ex. K. After his deposition, and after reviewing the other experts' supplemental reports, Pecoraro again supplemented his own report. See id. at Ex. N (including Aug. 2, 2010 letter). He noted the cap on the bottle at issue had "severely distorted" crimping, which would be "consistent with the problems with the capping equipment" revealed during discovery. Id. Additionally, Pecoraro characterized his own opinion as "identical to" Buchman's supplemental opinion, which concluded a flaw in the bottle was introduced during manufacturing

---

course, is inadmissible because it is not based on personal knowledge, see Fed. R. Evid. 602, nor is it based on sufficient facts, data, and reliable principles and methods required of expert testimony, see Fed. R. Evid. 702. Accordingly, Pecoraro's comments in this regard cannot constitute an expert opinion that Anchor is responsible for introducing a defect into the bottle that injured Plaintiff. See Cohen v. Albert Einstein Med. Ctr., N. Div., 592 A.2d 720, 723-24 (Pa. Super. Ct. 1991).

or, "more likely," during bottling and capping at High Falls. Id.; see also id. at Ex. R.

No jury could return a verdict against Anchor on Plaintiff's claims, MAB's claims, or any party's cross-claims absent evidence the bottle was defective when it left Anchor's control. See Pappas, 136 F. Supp. 2d at 427-28. After carefully considering each expert's opinion, and viewing them in the light most favorable to the nonmoving parties, see Ray, 626 F.3d at 173, I conclude no such evidence has been adduced here. Neither Medoff nor Bayer believes there was any defect in the bottle at all. Pope believes a defect was introduced during capping by High Falls. Clauser and Buchman believe it is "more likely" a defect was introduced by High Falls than by Anchor, and both admitted they cannot identify any evidence of a manufacturing defect by Anchor. Finally, Pecoraro could not opine with a reasonable degree of engineering certainty that Anchor, and not High Falls, introduced a flaw into the bottle. In fact, in the most recent supplement to his report, he agreed with Buchman that the capping process at High Falls was the more likely cause of any defect.

In the end, the only thing any expert has concluded with respect to Anchor is that the manufacturing process "possibly" or "could have" caused a defect that might account for Plaintiff's injury. Such statements cannot support a jury verdict against Anchor. See Kovach v. Central Trucking, Inc., 808 A.2d 958, 959-60 (Pa. Super. Ct. 2002) (citing Cohen, 592 A.2d at 723-24); cf. State Farm Fire & Cas. Co. V. Holmes Prods., 165 F. App'x 182, 184-87 (3d Cir. 2006) (fire investigator precluded from offering expert testimony ruling out all causes of a fire except for contact between lamp and draperies, and speculating dog may have started fire by knocking lamp into draperies).

8

Accordingly, Anchor Glass's motion for summary judgment is granted.[5] An appropriate order follows.

---

[5] The various cross-claims Anchor Glass's co-defendants have asserted against it are dismissed with prejudice for the same reasons set forth above.